UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
v. : CR No. 12-178S
:
NORMAN L. CIPRIANO :

**REPORT AND RECOMMENDATION
REGARDING RESTITUTION AMOUNT**

Lincoln D. Almond, United States Magistrate Judge

Defendant Norman Cipriano pled guilty to one count of trafficking in counterfeit goods (18 U.S.C. § 2320(a)) on August 5, 2013. He was sentenced to fifty months of incarceration. Defendant's conviction arose out of his sale of counterfeit merchandise including apparel and perfume at the Raynham Flea Market. On September 19, 2012, a search warrant was executed at Defendant's residence resulting in the seizure of approximately 14,700 items primarily consisting of counterfeit merchandise and over $50,000.00 in U.S. currency. Over Defendant's objections, the amount of loss for sentencing purposes was set at $1,027,433.48. Such amount was calculated by applying the manufacturer's suggested retail price (MSRP) for the lawfully licensed items to the counterfeit or "knockoff" flea market inventory seized at Defendant's residence. Pursuant to 18 U.S.C. §§ 3556 and 3664(d)(6), Chief Judge William E. Smith referred the issue of the restitution amount to me for a report and recommendation. Pursuant to this referral, a hearing was held on December 17, 2014 and briefs were filed by both sides.

The Mandatory Victim's Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, requires that defendants pay restitution to the victims of their crimes. Under the MVRA, victims are those "directly and proximately harmed as a result of the commission of an offense for which restitution

may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Here, Defendant has been convicted of an offense against property making restitution mandatory. See 18 U.S.C. § 3663A(c)(1)(A)(ii). Defendant has pled guilty to violating 18 U.S.C. § 2320(a) by trafficking in counterfeit goods which infringed upon trademarks held by others. It is the theft of another's intellectual property.

Under the MVRA, the Government bears the burden of demonstrating the amount of the loss sustained by a victim as a result of the offense. 18 U.S.C. § 3664(e). However, the Government bears a somewhat relaxed burden to establish the amount of a victim's actual loss for the calculation of criminal restitution. United States v. Newell, 658 F.3d 1, 34 (1st Cir. 2011) (citing 18 U.S.C. § 3664(e)). Consistent with the policy goal of MVRA to compensate victims, "[o]nly a modicum of reliable evidence is required to establish a restitution award." United States v. Curran, 525 F.3d 74, 84 (1st Cir. 2008) (quoting United States v. Mahone, 453 F.3d 68, 74 (1st Cir. 2006)); see also United States v. Salas-Fernandez, 620 F.3d 45, 48 (1st Cir. 2010); United States v. Matos, 611 F.3d 31, 45 (1st Cir. 2010). If the Government produces some probative evidence of actual loss, a defendant is required to counter it with probative evidence of his own. See United States v. Burdi, 414 F.3d 216, 222 (1st Cir. 2005). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e); cf. United States v. Vazquez, 724 F.3d 15, 29 (1st Cir. 2013) (government's burden at sentencing is preponderance). When proof of restitution losses involves a complex calculation, the Government can meet its burden by articulating a sound basis for approximation of the loss, and the Court may consider the lack of

probative contrary evidence presented by the defendant. United States v. Gushlak, 728 F.3d 184, 202 and n.15 (not an impermissible shift of the burden of proof to reason that the onus is on defendant to identify events other than fraud that contributed strongly to losses).

At the restitution phase, the usual rules of evidence do not pertain, provided that the information has sufficient indicia of reliability to support its probable accuracy. United States v. Gallardo-Ortiz, 666 F.3d 808, 811 (1st Cir. 2012); see United States v. Rodriguez, No. 12-1476, 2013 WL 5345366 at *8 (1st Cir. Sept. 25, 2013) (at sentencing court may consider hearsay that has never been subjected to cross-examination). In setting the restitution amount, a sentencing court is not held to a standard of absolute precision, but wields considerable discretion to expeditiously make a "reasonable determination of appropriate restitution," though it cannot rely on "gossamer strands of speculation and surmise." Salas-Fernandez, 620 F.3d at 48; United States v. Innarelli, 524 F.3d 286, 294 (1st Cir. 2008); United States v. Corey, 77 F. App'x 7, 10 (1st Cir. 2003); United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997). The focus must be on "achieving fairness to the victim." Corey, 77 F. App'x at 10. Congress did not intend the restitution calculation to turn "into a time-consuming sideshow [of] prolonged litigation over restitution-related issues," but rather evinced clearly a "preference for rough remedial justice, emphasizing victims' rights." Vaknin, 112 F.3d at 587. The Government need not present a mini-trial to establish the victims' rights to restitution. Gushlak, 728 F.3d at 194 (affidavits on timing and manner of scheme may be relied on without requiring live testimony and opportunity for cross examination).

In this case, the Government identifies two types of potential violations: the owners of the intellectual property whose rights were infringed, and consumers who were fraudulently lured into purchasing the infringing knockoff goods. However, it only seeks restitution for the former and not

the latter group because "determining restitution that may be due to defrauded [flea market] customers is not practicable in this case because the class of victim is too large, too difficult to identify and the actual loss to individual consumers is de minimis." (See Document No. 76 at p. 7, citing 18 U.S.C. § 3663A(c)(3)).

Although the Government points to evidence[1] suggesting that Defendant was engaging in unlawful infringement for several years, it focuses its restitution argument on the "inventory" seized at Defendant's house rather than on his past sales. It reasonably posits that the actual counterfeit merchandise seized from Defendant is the "only definite and readily provable measure of the bogus goods that he brought into the U.S. marketplace for sale" "but it is not nearly the total value of the harm he caused." (Document No. 76 at p. 14).

The Government seeks a restitution order in the total amount of $160,607.86: lost profits for nine corporate victims of $155,232.86 and administrative and investigative costs of $5,375.00 for two corporate victims. However, it has already seized and forfeited $132,012.12 from Defendant which will be made available to victims and thus the proposed restitution to be ordered due from Defendant is $28,595.74.

The Government's request is supported by the Affidavit of U.S. Customs Agent Rachel L. Robinson. She testifies as to the process used to obtain lost profit information from the victims. Many victims took the position that the amounts involved were too small to justify the effort and/or the risk of disclosure of proprietary information. The victims who did respond multiplied their per item profit or royalty amount by the number of items seized to come up with an aggregate lost profit amount. Defendant argues that, although he has "no articulable basis" to dispute these alleged lost

---

[1] This evidence includes financial activity and bank records, prior instances of the border seizure of counterfeit goods on route to Defendant, and past undercover surveillance of his sales activities at the Raynham Flea Market.

profit figures, they are simply not an accurate guide, and no restitution should be imposed because it is impossible to accurately determine the actual amount of victim loss.

As a practical matter, counterfeit goods are typically of inferior quality since they are not subject to the production and quality control demands of a trademark licensor. Also, because of inferior quality, the prices fetched for such goods at flea markets is significantly lower than the prices paid by consumers in other retail channels. For instance, it is undisputable that both the price and quality of an officially licensed NFL game jersey purchased at the Patriots Official Pro Shop at Gillette Stadium are higher than a knockoff purchased at the Raynham Flea Market. These are distinct customer markets and thus it does not necessarily follow that every flea market sale made by Defendant would correlate to a lost legitimate sale elsewhere. However, that does not mean that Defendant's crime did not economically harm the victims. It did. In addition to some level of lost sales, the victims suffered a diminution of the value of their brands due to market proliferation, reputational damage due to inferior quality and appearance, and enforcement expenses to police the misuse of their intellectual property. These are real economic costs and the reason why there are both serious civil and criminal penalties for trademark infringement.

If the Government's burden were to precisely demonstrate victim losses, it would not meet its burden in this case. However, as previously noted, absolute precision is not required. The Government's submission presents a sufficient indicia of reliability to support a restitution award and meet its legal burden under the MVRA. Applying equitable principles of fairness to the victim, rough remedial justice[2] and respecting the due process interests of Defendant, I recommend that

---

[2] It is apparent from the record that Defendant was in the knockoff business for quite a period of time prior to his arrest. Thus, it is reasonable to conclude that the "inventory" seized from Defendant's house at the time of his arrest was but a fraction of his actual total sales since it makes no sense that a fairly long-established business would have inventory on hand on a particular day which was equal to or greater than the totality of its sales since the operation's

Chief Judge William E. Smith order victim restitution against Defendant in the net amount of $28,595.74 calculated as follows:

1. **Coalition to Advance the Protection of Sports Logos**
   $85,598.63 (lost royalty revenue)
   $4,375.00 (administrative costs)

2. **City Inc.**
   $15,212.79 (lost profits)

3. **Estée Lauder**
   $12,383.68 (lost profits)

4. **LVMH Perfumes and Cosmetics Group**
   $12,504.60 (lost profits)

5. **Abercrombie and Fitch Trading Co.**
   $6,166.16 (lost profits)
   $1,000.00 (administrative costs)

6. **Chanel**
   $7,215.00 (lost profits)

7. **UGG**
   $5,467.00 (lost profits)

8. **North Face**
   $8,460.00 (lost profits)

9. **Burberry**
   $2,225.00 (lost profits)

**Total Gross Restitution**
$160,607.86


**Forfeited Assets of Defendant Available for Restitution**
$132,012.12

**Total Net Restitution Due from Defendant**

---

inception. Accordingly, the use of the inventory as the basis for restitution likely understates total victim losses.

$28,595.74

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. Fed. R. Crim. P. 59(b)(2); Local Rule Cr. 57.2(d)(1). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's Decision. <u>United States v. Valencia-Copete</u>, 792 F.2d 4 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603 (1st Cir. 1980).

  /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
February 10, 2014